UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BURL OSBORNE,

Plaintiff,                          11-CV-6380 CJS

-v-

THE COUNTY OF SENECA, RICHARD E.
SWINEHART, as District Attorney for the County
of Seneca and individually, DAVID G. MASHEWSKE,
MARK SINKEWICZ, PATRICK J. MORRELL,
ROBERT STEELE, as employees of the Office
of the Seneca County District Attorney and
individually, and ROBERT SCHULTZ, as a member
of the New York State Police and individually,

Defendants.

---

APPEARANCES

For Plaintiff:              Jeffrey P. DiPalma, Esq.
                            Osborn, Reed & Burke, LLP
                            45 Exchange Boulevard
                            Rochester, New York 14614

For Defendant Robert
Schultz:                    Gary M. Levine, Esq.
                            Assistant Attorney General
                            Office of the New York State Attorney General
                            144 Exchange Boulevard, Suite 200
                            Rochester, New York 14614

INTRODUCTION

This is an action brought by a former Deputy of the Seneca County Sheriff's

Department who claims that he was wrongfully targeted for investigation and  prosecution

by the former Seneca County District Attorney, Richard Swinehart, and his staff ("the

Seneca County Defendants") and New York State Trooper Robert Schultz ("Schultz").  Now

before the Court is Schultz's motion [#29] for summary judgment. The application is granted.

BACKGROUND

Unless otherwise noted, the following are the facts of this case viewed in the light most-favorable to Plaintiff, the non-moving party. In that regard, Local Rule of Civil Procedure 56 states, in pertinent part:

> **Movant's Statement.** Upon any motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, there shall be annexed to the notice of motion a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.

> **Opposing Statement.** The papers *opposing* a motion for summary judgment *shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs* and, if necessary, additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried. *Each numbered paragraph in the moving party's statement of material facts will be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement.*

Local Rule Civil Procedure 56(a)(1)&(2) (emphasis added). Schultz has submitted a Rule 56 Statement [#29-1] consisting of 22 numbered paragraphs. Plaintiff submitted his own Rule 56 Statement [#32-1], but it does not specifically controvert the allegations in Schultz's statement. Accordingly, the Court accepts Schultz's statements of fact as true insofar as they are not specifically contested. Additionally, while the Court accepts the factual statements in Plaintiff's Rule 56 Statement, his submission contains certain

assertions which are arguments, not facts, and which are not supported by the documents they cite,[1] and the Court therefore does not accept those assertions as true for purposes of this motion.

The Seneca Meadows Landfill is located on the east side of New York State Route 414, in Waterloo, New York, approximately 3.6 miles south of Exit 41 of the New York State Thruway. A travel plaza containing a Petro gas station and a restaurant is located near the Thruway entrance, on the east side Route 414, across from the Exit 41 toll booths. A Nice N Easy convenience store/gas station is located at the intersection of Routes 414 and 318, between the Seneca Meadows Landfill and the Thruway exit.[2]

On December 30, 2008, a commercial truck driver named Frederick Grant ("Grant") was delivering a truckload of waste to the Seneca Meadows Landfill. At approximately 6:00 p.m., Grant had delivered his load and was preparing to exit the landfill and turn left onto Route 414, going North, toward the Thruway exit. At that same moment, Burl Osborne ("Plaintiff") was riding in a car driven by his daughter's fiance/boyfriend, Jeffrey Jones ("Jones"), heading north on Route 414. As Grant turned into the roadway, Jones had to swerve in order to avoid a collision with Grant's truck.[3] Gary Bessette ("Bessette"), another truck driver, who was familiar with Grant, was also exiting the landfill at the same time, and witnessed the near-collision between Grant's truck and the car in which Plaintiff

---

[1]For example, paragraph 12 of Plaintiff's Rule 56 Statement states that Schultz drafted an affidavit from Gary Bessette that he knew to be "patently false." For support, the Rule 56 Statement cites Schultz's Affidavit, Ex. A. p. 3. However, that exhibit does not support the contention.

[2]The Court is familiar with this area, and also takes judicial notice of the locations from maps.

[3]Jeffrey Jones, the driver of the vehicle in which Plaintiff was a passenger, indicated to police that he "swerved to avoiding hiting [Grant's truck] and went off the road." Docket No. [#28-2] at p. 13.

was riding.  After the near collision, Grant drove north to the travel plaza.  Plaintiff, who was an off-duty deputy employed by Seneca County, and who was carrying a pistol, directed Jones to pursue Grant.  Plaintiff also made a 911 call[4] regarding the near-collision. Bessette exited the landfill and also went north on Route 414, but stopped at the Nice N Easy convenience store, while Grant and Plaintiff continued north to the travel plaza.

At the travel plaza, Jones followed Grant's truck into the parking lot, and Plaintiff exited Jones' car and pointed his gun at Grant, who was still inside his truck.  Plaintiff ordered Grant to get out of his truck, and threatened to shoot Grant if he did not comply. Grant got out of the truck, and Plaintiff held him at gunpoint for several minutes until members of the Seneca County Sheriff's Department arrived.

There were a number of witnesses to these events.  Of those, on December 30, 2008, the Seneca County Sheriff's department took written statements from at least the following persons: 1) Grant; 2) Bessette; 3) Jones; 4) James Onley ("Onley"); 5) Matthew Springer ("Springer"); 6) Thomas Smith ("Smith"); and 7) Anton Heindl ("Heindl").

To the extent that some of these affidavits are pertinent to the subject motion, the Court will quote them extensively.  Grant's affidavit states, in pertinent part:

> They [Osborne and Jones] followed me into the Petro truck stop and followed me around the parking lot . . . then [Osborne] ordered me out of the truck by gunpoint w/out telling me he was an officer and when I asked him several times to put his gun down I begged him and he said get out lay on the ground and shut up or he would put 15 rounds into my head.  Still not telling me he was an officer yet.  Then I got out almost in tears and he

---

[4]Plaintiff provided the Court with an audio cd of his 911 call, in which he alleges that Grant "ran him off the road."  The 911 operator tells Plaintiff, in pertinent part, that she will alert police officers, who will most likely detain the truck at the Thruway entrance.  Plaintiff responds to the 911 operator, and it is somewhat curious that the sound quality on the recording suddenly worsens at that precise moment.  However, from listening to the recording numerous times, Plaintiff states, "I'm going to shoot his tires out if he doesn't stop."

grabbed me [and] held the gun in front of me a couple feet away and ordered me to shut up or he would shoot me.  Another man I work with [Springer] asked the man with the gun for identification and he showed it.  I tried to walk away and shut my truck off and he [Osborne] held onto me and said don't move I'm telling you I'll kill you like you tried to kill me.  Then the officer showed up. [sic]

Docket No. [#29-3] at p. 6.  Bessette also gave a statement, as follows:

On 12/30/08 I was leaving the Seneca Meadows land fill.  Fred Grant was ahead of me.  There was a dark vehicle coming up [Route 414,] he was about 2 tractor trailer lengths behind Fred.  I watch him pick up speed and I thought he was going to pass Fred Grant on the right but he backed out it [sic] and stayed right behind him.  I turned around because I decided not to go to the Petro.  To me I didn't think anything of it.

Docket No. [#29-3] at p. 12.  Obviously, this statement from Bessette does not mention events at the travel plaza.  However, as will be discussed further below, it is evident that although Bessette did not go to the Petro travel plaza immediately after leaving the landfill, he went there eventually because he was at the Petro travel plaza when Seneca County Sheriff's deputies took his statement.

James Onley also provided a written statement to police, which states in pertinent part:

12-30-08 about 1700 I pulled into Petro, I was looking for place to park up front.  As I was circling the parking lot I notice[d] a semi, speeding kicking up dirt.  Then I saw a black Jeep with [the] passenger door open.  The passenger was running after the truck yelling ["G]et him Jeff["] [evidently referring to Jones, who was driving the Jeep]  Then I saw an opening and as I was parking I notice[d] a man with [illegible] blue coat, Levis - pointing a gun at the truck driver . . . he came around [the] corner . . .  yelling at him, to get out of truck or he would shoot him.  The [truck] driver tried to put it in reverse to get away but by this time, the man with gun was by [the] driver['s] door.

> *And I could see [that the] people in [the] truck was scared.*  What was done
> on [the] driver's side I don't know.

Docket No. [#29-3] at p. 15 (emphasis added).  As mentioned earlier, sheriff's deputies

also took  statements from Springer, Smith, Heindl and Jones, and they essentially

corroborate various aspects of  Grant's and Onley's versions of events.

No criminal charges were filed against anyone as a result of the December 30,

2008, incident and the ensuing investigation by the Seneca County Sheriff.  However, on

or about May 26, 2009, Seneca County District Attorney Richard Swinehart ("Swinehart")

requested the assistance of the New York State Police in re-investigating the incident.

Schultz, an investigator with the State Police, was assigned by his supervisor to assist

Swinehart.[5]  Schultz re-contacted witnesses and took additional written statements from

Onley, Bessette, and Grant's brother, Leslie Grant ("Leslie"), who claimed to have been a

passenger in Grant's truck on December 30, 2008.

On June 9, 2009, Onley executed an affidavit in Rockford, Illinois, where he lives,

and sent it to Schultz.[6]  As noted earlier, Onley's original statement had indicated that there

was more than one person in the cab of Grant's truck at the time of the incident. ("I could

see [that the] *people* in [the] truck was scared.") (emphasis added).  In the affidavit he

provided to Schultz, Onley provided a more extensive statement, in pertinent part as

follows:

> When I was pulling into the Petro I noticed an 18 wheeler garbage hauler
> truck going fast around the parking lot.  All of a sudden I noticed a dark

---

[5] *See*, Docket No. [#29-2] at p. 6, "Narrative" ¶ 1.

[6] Schultz prepared the affidavit after speaking with Onley on the phone, and mailed it to Onley.

colored Jeep come out of nowhere.  It stopped in front of me.  The passenger jumped out of the Jeep and yelled, "Go get him, Jeff."  He didn't even take the time to close the passenger door.  This guy was a white male about 5 foot 8 inches tall, about 200 to 220 pounds, and was wearing blue Levis.  He ran towards the parked trucks and the guy in the Jeep followed the garbage hauler truck.  I then pulled into an open spot near the Petro building where the restaurant is.  I then noticed a bunch of people looking.  The guy that got out of the Jeep was walking in front of my truck.  I looked out my right mirror and saw the garbage truck coming around behind me.  As the truck came around I then saw the guy that got out of the Jeep pointing a gun at the driver of the truck.  The gun was black and looked like a 45 automatic pistol to me.  The man was only about 10 feet from the driver's side of my truck at this time.  I had my window down and I heard the guy yelling stop or I'll shoot you.  He said this numerous times.  I called 911 on my cell phone and told the dispatcher, "You better get some state troopers out here right now at the Petro back by the restaurant because there is a man with a gun who is going to shoot a truck driver."  The truck driver stopped and the man with the gun walked up to the driver's side of the truck and told the driver to get out.  The driver kept saying, "What did I do, what did I do."  They were about 20 feet from me at the time.  *I then noticed the passenger in the truck kind of scooting down in the seat.  The he opened the passenger side door real easy and got out of the truck.  He got behind some other truck drivers.*  The guy with the gun was still screaming at the truck driver and the truck driver finally opened the door and got out.  The guy with the gun got right in the face of the truck driver and was pointing the gun at his head.  The guy who was driving the Jeep had come walking up towards the guy with the gun.  Within a couple of minutes a marked police car pulled up.  The guy with the gun then put his gun away on his right side, I believe.  The cop that pulled up never drew his gun, so I think he must have known the guy with the gun.  I never heard the guy with the gun identify himself as a police officer.  The only time I found out was when I gave my statement to the uniformed police officer.  The deputy told me that this cop was just a court deputy.

Docket No. [#29-2] at pp. 10-11 (emphasis added).

On June 27, 2009, Bessette provided an affidavit to Schultz, which provided significantly more information than his original statement to the Seneca County Sheriff's Department.  Specifically, Bessette's affidavit states, in pertinent part:

> Back on December 30th, 2008, I was working for Karl Johnson Trucking, Lyndonville, Vermont.  On December 30, 2008 sometime between 5:30 PM and 6:00 PM, I was coming out of the landfill on Route 414 in Waterloo. Another driver for Karl Johnson Trucking, Fred Grant, was also coming out of the landfill.  He was just ahead of me waiting to turn left onto Route 414. There was a car on Route 414 in the northbound lane waiting to turn  left into the landfill.  I saw Fred Grant pull out onto Route 414 to head north.  He was in the middle of his turn when I saw a blue Jeep try to go around the car that was stopped waiting to turn left into the landfill.  The Jeep also appeared to be trying to pass Fred Grant on the right.  I saw the Jeep run off the shoulder of the roadway.  It was fishtailing and ended up going into the field towards a driveway from a business across the street.  I then saw the Jeep come back onto Route 414 from that driveway.  I pulled out onto Route 414 after the Jeep began heading north.  . . .  I continued northbound and went to the Nice N Easy store at the corner of Route 318 and 414.  I went into the store and bought a cup of coffee and a tuna fish sub.  _My cell phone then rang. It was Fred Grant's girlfriend, Holly.  I don't know her last name.  Holly was crying and told me that Lester,[7] Fred's brother, called her and was crying and said that some guy had a gun to Fred's head.  She said that this was happening at the Petrol [sic] parking lot.  I then headed to the Petrol [sic], and when I pulled in at the back of the building there was a man standing there with a gun pointed at Fred._  Fred was standing outside of his truck near the driver's side front fender.  When I saw this, I stopped my truck and ran into the Petrol [sic] to try to get somebody to call the police. I had left the Nice N Easy so fast that I just threw my cell phone into the truck and I could not find it.  I went into the CB shop and asked the guy who was working there to call the police because there was a guy pointing a gun at Fred.  I then went back out and walked towards Fred's truck.  I saw that there were at least two sheriff's cars and a black unmarked Ford Taurus.  I saw that Fred Grant as now in the back of one of the sheriff's cars.  I motioned with my

---

[7]As indicated, Grant's brother's name is Leslie.

hands towards Fred to try to get him to calm down because he was crying. I then saw the guy that had the gun pointed at Fred standing outside of the sheriff's car that Fred was in.  I heard him talking to another deputy.  I heard him asked [sic] this deputy if he [Grant] was denying that he ran him off the road.  The deputy said, "Yes, he is denying it."  The guy that had the gun then said, "I should have shot the fat slob when I had the chance."[8]  I was about 15 to 20 feet from them at the time.  Then another heavyset deputy came up to me and told me to get up on the sidewalk near the Petrol [sic] building.  I did this and then a deputy came up and I told him that I saw Fred Grant pull out of the landfill, and I didn't think he cut this guy off.  I was then approached by another deputy, who asked me if I saw what happened.  I said yes, and he asked me if I would give a statement.  I told him yes and we both went inside the Petrol [sic].  The deputy gave me a statement form and asked me to write down what I saw.

Docket No. [#29-2] at pp. 13-14 (emphasis added).

Schultz completed his investigation and provided the results to Swinehart. Swinehart used the information provided by Schultz to prosecute Plaintiff.  A court subsequently dismissed the criminal action against Plaintiff, and he now claims that he was maliciously prosecuted for political reasons.  On August 1, 2011, Plaintiff commenced this action.  The Amended Complaint [#24] alleges that Schultz conspired with Swinehart in "concoct[ing] charges against former Seneca County Sheriff, Leo Connolly," and in attempting to discredit Plaintiff, who was scheduled to testify in a grand jury considering charges against Connolly.  Specifically, the pleading contends that Schultz "helped two disreputable and unbelievable 'witnesses' fabricate false accusations" against Plaintiff, referring to Bessette and Leslie. In short, the Amended Complaint alleges, under Section 1983, that Schultz violated Plaintiff's federal constitutional rights, by causing Bessette and

---

[8]A Seneca County sheriff's deputy concurs that Plaintiff stated, "I should of just shot him." See, Docket No. [#32-1] at p. 15.

Leslie to provide false affidavits, in order to assist Swinehart and the other Seneca County defendants in maliciously prosecuting Plaintiff.

On January 8, 2013, Schultz filed the subject motion [#29] for summary judgment. In support of the motion, Schultz has provided an affidavit in which he swears to the following facts: 1) neither Swinehart nor anyone else directed him to obtain false witness statements; 2) he re-interviewed Smith, Heindl, Bessette and Onley, and interviewed Leslie, and took written statements from Bessette, Onley and Leslie ; and 3) he did not lie or cause any of the witnesses to lie.  Schultz further maintains that he did not maliciously prosecute Plaintiff because he did not act with malice, and because he neither instituted nor maintained the prosecution.  Additionally, Schultz maintains that there was probable cause for the prosecution on the charge of menacing.  Alternatively, Schultz contends that he is entitled to qualified immunity, since he acted reasonably.

Plaintiff opposes the motion and insists that Schultz knew that the affidavits he obtained from Bessette and Leslie  were false, for reasons discussed further below.[9]

## DISCUSSION

### Rule 56

Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S.*

---

[9]Plaintiff opposes the motions on the merits.  Although he mentions, in passing, that the parties have only conducted limited discovery, he did not make any request under Rule 56(d), formerly Rule 56(f). *See*, DiPalma Decl. [#32] at ¶ ¶ 3-4.

*v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

A party cannot demonstrate a triable issue of fact based on mere speculation or conjecture. *See, e.g., U.S. v. Potamkin Cadillac Corp.*, 689 F.2d 379, 381 (2d Cir. 1982) ("[I]n order to defeat a motion for summary judgment, the opposing party must set forth *specific facts* showing that there is a genuine issue for trial.  Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants.") (emphasis added; citations and internal quotation marks omitted); *see also, D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some *hard evidence* showing that its version of the events is not wholly fanciful.") (emphasis added); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) ("In determining whether a genuine issue of material fact exists for trial, we are obliged carefully to distinguish between evidence that allows for a reasonable inference . . .  and evidence that gives rise to mere speculation and conjecture.") (citation and internal quotation marks omitted).

Plaintiff maintains that the affidavits Schultz obtained from Bessette and Leslie were false, and that Schultz knew they were false.  As proof of that, Plaintiff essentially relies on three assertions: 1) that Bessette's first statement to police did not indicate the he went to Petro; 2) that Grant's statement to police did not indicate that his brother Leslie was a

witness; and 3) that Leslie should not have been in New York, since he was registered sex offender who was required by law to remain in Vermont.

With regard to the first of these, Plaintiff contends that Bessette's affidavit was false, and Schultz knew it, since he "had the sworn statement . . . which [Bessette] gave on December 30, 2008, wherein Bessette stated that he was not at the scene where the incident took place and therefore could not have been a witness." Pl. Memo of Law [#32-2] at p. 2.  However, that argument misrepresents what Bessette's initial statement actually said.  In fact, as demonstrated above, Bessette's initial statement did not indicate that he was never at the Petro travel plaza, or that he did not witness the events at the plaza. Instead, his initial statement merely indicated that he did not follow Grant to the Petro immediately following the near collision.  As previously noted, Bessette obviously went to the Petro subsequently, since he was at the Petro and gave a statement to police immediately following the incident in which Plaintiff pointed his gun at Grant.  Moreover, Bessette's subsequent affidavit clarifies that he left the Nice N Easy and went to the travel plaza because he received a telephone call from Grant's girlfriend, telling him that a man was holding Grant at gunpoint.  Furthermore, the affidavit that Bessette provided to Schultz explains the context in which he provided his first statement, which is that he told the Seneca County Sheriff's deputies that he witnessed the near collision at the land fill, and did not think that Grant was at fault.  As far as the record indicates, Bessette is the only individual besides those persons directly involved in the near collision (Grant, Leslie, Plaintiff and Jeffrey Jones) to have witnessed the genesis of the violent confrontation between the two men.  Consequently, it is not surprising that Bessette's initial statement pertained only to the near collision.  The fact that Bessette's initial statement did not also

12

describe what he saw at the Petro does not reasonably imply that his subsequent affidavit was false.[10]   Moreover, Plaintiff apparently has no personal knowledge concerning Bessette's whereabouts on December 30, 2008, and has not otherwise provided any evidence to refute Bessette's sworn statements.   Accordingly, the alleged discrepancy between Bessette's two statements is insufficient to create a triable issue of fact as to whether Bessette's statement to Schultz was false. *See, Holmes v. Lorch*, No. 03 Civ.4616 LTS THK, 2004 WL 2102336 at *2 (S.D.N.Y. Sep. 21, 2004) ("The information contained in Plaintiff's supplemental affidavit is not directly inconsistent with any of the information contained in the pleadings, prior affidavits and other prior submissions, and can reasonably be viewed to be consistent with statements made by Plaintiff in his prior affidavit[.]").

Plaintiff's second point is that Leslie must have lied in his affidavit about having witnessed the incident, since his brother never mentioned him in the statement that he gave to police on December 30, 2008.   However, the Court again disagrees.   First and foremost, there is no indication that on December 30, 2008, the police ever asked Grant whether he was traveling with anyone else.   Instead, Grant was apparently asked to describe what happened *to him*, namely, how he came to be held at gunpoint by a man threatening to shoot him in the head.   Moreover, Plaintiff's suggestion that Grant was traveling alone is also belied by Onley's initial statement, which indicated that there were "people," that is, multiple persons, in the truck, and by Onley's subsequent affidavit, in

---

[10]Plaintiff maintains in this action that upon confronting Fred Grant at the travel plaza, he immediately identified himself as a police officer.  The Court observes, however, that the sworn statement given to police by Jones, who was driving the car in which Plaintiff was a passenger, and who is the boyfriend/fiancé of Plaintiff's daughter,   does not indicate that Plaintiff identified himself as a police officer at any time. *See*, Docket No. [#29-3] at p. 19.  Applying Plaintiff's logic, if Jones were to now testify at trial that Plaintiff identified himself as a police officer, he would be committing perjury.

which he described how he watched the passenger "scoot" down in the seat and then carefully exit the truck as Plaintiff was pointing his gun at Grant. In short, the fact that Grant's statement to police on December 30, 2008 does not mention his brother Leslie does not create a triable issue of fact as to whether Leslie's affidavit is false.[11]

Plaintiff's third and related argument is that Schultz must have known that Leslie's affidavit was false, since Leslie is a registered sex offender who, by law, was not supposed to enter New York State without permission. Again, though, the Court disagrees. In fact, Leslie's status as a sex offender has no bearing on whether he was actually present in New York State on December 30, 2008. In that regard, Leslie has provided a sworn statement that he was riding with his brother on December 30, 2008, and Plaintiff has not produced evidentiary proof in admissible form to the contrary. For example, neither Plaintiff or Jones, or anyone else, has provided the Court with an affidavit indicating that Grant was alone in the cab of his truck, or that Leslie was actually in Vermont, at the time of the incident. Rather, the Court has before it an affidavit indicating that it was Leslie's presence at the scene, and his panicked phone calls, which led to Bessette leaving the Nice N Easy and going to the Petro.[12]

---

[11]The Amended Complaint also contends that Plaintiff was provided with a "police report identifying *all witnesses* who were at the scene," which does not list Leslie Grant. *See,* Amended Complaint [#24] at ¶ 31 (emphasis added). That assertion is highly dubious, given the large number of witnesses who were apparently present at the travel plaza, and the small number of statements that were taken by the Seneca County Sheriff's Department. In any event, the Court has not been provided any such contemporaneous report, purporting to list each and every witness.

[12]The Amended Complaint contends that Plaintiff was provided with a "police report identifying *all witnesses* who were at the scene," which does not list Leslie. *See,* Amended Complaint [#24] at ¶ ¶ 31-32 (emphasis added). That assertion is unsupported and highly dubious, given the large number of witnesses who were apparently present at the travel plaza, *see,* docket no. [#32-1] at p. 15, and the small number of statements that were taken by the Seneca County Sheriff's Department. In any event, the Court has not been provided any such contemporaneous report, purporting to list each and every witness.

Furthermore, even assuming that Leslie was lying about having witnessed the incident, which has not been shown, Plaintiff still has not explained how Schultz would have known that Leslie's affidavit was false.  Once again, the mere fact that Leslie was not mentioned in Fred's statement to police would not reasonably have led Schultz to conclude that Leslie was not an actual witness to the events at issue in this lawsuit.

For all of the foregoing reasons, Plaintiff has not raised a triable issue of fact as to whether the affidavits that Schultz obtained from Onley, Bessette and Leslie are false, or whether Schultz knew that the affidavits were false. Consequently, since all of Plaintiff's claims against Schultz are based on Schultz having procured false affidavits, Schultz is entitled to summary judgment.

## CONCLUSION

Schultz's motion [#29] for summary judgment is granted, and the claims against him are dismissed with prejudice.

SO ORDERED.

Dated:      June 5, 2014
            Rochester, New York

                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge