UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BURL OSBORNE,

                            Plaintiff,              11-CV-6380 CJS

          -v-

THE COUNTY OF SENECA, RICHARD E.
SWINEHART, as District Attorney for the County
of Seneca and individually, DAVID G. MASHEWSKE,
MARK SINKEWICZ, PATRICK J. MORRELL,
ROBERT STEELE, as employees of the Office
of the Seneca County District Attorney and
individually, and ROBERT SCHULTZ, as a member
of the New York State Police and individually,

                            Defendants.

APPEARANCES

For Plaintiff:              Jeffrey P. DiPalma, Esq.
                            Osborn, Reed & Burke, LLP
                            45 Exchange Boulevard
                            Rochester, New York 14614

For Seneca County
Defendants:                 Michael P. McClaren, Esq.
                            Jeremy A. Colby, Esq.
                            Webster Szanyi LLP
                            1400 Liberty Building
                            Buffalo, New York 14202

INTRODUCTION

        This is an action brought by a former Deputy of the Seneca County Sheriff's

Department who claims that he was maliciously prosecuted by the former Seneca County

District Attorney, Richard Swinehart, and members of his staff ("Defendants").[1]  Now before

---

[1]Robert Schultz, a New York State Police Investigator, is also a defendant.  By separate Decision and Order, the Court is granting Schultz's motion for summary judgment.

the Court is Defendants' motion (Docket No. [#26]) to dismiss the Amended Complaint.  The application is granted.

BACKGROUND

Defendants are moving to dismiss pursuant to FRCP 12(b)(6).  It is of course well-settled that in resolving a 12(b)(6) motion, the Court is limited as to what it can consider. *See, Vasquez v. City of New York*, No. 10 Civ. 6277(LBS), 2012 WL 4377774 at *1 (S.D.N.Y. Sep.24, 2012) (On a 12(b)(6) motion, "a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference, ... matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.' " *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002) (*quoting Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993)).").

Here, the Amended Complaint repeatedly mentions a number of documents that are not actually attached to the pleading.  Specifically, the Amended Complaint describes, and alludes to the contents of, police reports and written witness statements concerning an incident that occurred on December 30, 2008, as well as prosecutor's informations and misdemeanor informations that were filed against Plaintiff.[2]  The lynchpin of Plaintiff's claims is that some of these documents contain false information, while others were improperly filed or not turned over to him in a timely fashion as part of the prosecution against him in state court.  Accordingly, the Court will consider these documents, because to the extent they may not be expressly incorporated by reference into the Amended Complaint, Plaintiff obviously

---

[2]Amended Complaint [#24] at ¶ ¶ 4, 27, 30-32, 34-35, 37-40, 44, 51-54, 60, 66-69, 71, 79.

had them in his possession[3] and relied upon them[4] in drafting the pleading to such an extent that they are integral to the Amended Complaint.[5] *See, Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P.*, 129 F.Supp.2d 578, 581 (W.D.N.Y., 2000) ("[A] plaintiff should not be permitted to survive a motion to dismiss and put a defendant to the trouble and expense of discovery simply by excluding highly relevant facts and documents from its complaint.") (*citing Cortec Industries v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)[6]), *aff'd* 229 F.3d 1135 (2d Cir.2000) (table), *cert. den.* 532 U.S. 1037, 121 S.Ct. 1998, 149 L.Ed.2d 1001 (2001)).

The reader is reminded that much of the factual recitation that follows is based on Plaintiff's as-yet-unproven *allegations*, which the Court must assume to be true for purposes of this Decision and Order.

The Seneca Meadows Landfill is located on the east side of New York State Route 414, in Waterloo, New York, approximately 3.6 miles south of Exit 41 of the New York State Thruway. A travel plaza containing a Petro gas station and a restaurant is located near the

---

[3]*See*, Amended Complaint [#24] at ¶ ¶ 54, 60 (Plaintiff was provided with the witness statements during the underlying prosecution).

[4]Plaintiff obviously relied upon the statements, because his contention that certain affidavits are false is based upon comparing earlier witness statements with later witness statements. In opposing Defendants' motion, Plaintiff contends that the Court should not consider any documents submitted by Defendants, because they are untimely or improperly filed. *See*, Pl. Memo of Law [#31-1] at pp. 1-4. However, the Court disagrees. In that regard, Defendants indicated that they forwarded the documents to the Court just as soon as Plaintiff provided the documents to them. In any event, the Court is entitled to consider the documents because Plaintiff relied on them and they are integral to the pleading.

[5]The Court does not consider the affidavits that were submitted in connection with Defendant Robert Schultz's summary judgment application.

[6]*See, Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d at 47 ("[W]e have held that when a plaintiff chooses not to attach to the complaint or incorporate by reference a prospectus upon which it solely relies and which is integral to the complaint, the defendant may produce the prospectus when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure.") (citation omitted).

Thruway entrance, on the east side Route 414, across from the Exit 41 toll booths.  A Nice N Easy convenience store/gas station is located at the intersection of Routes 414 and 318, between the Seneca Meadows Landfill and the Thruway exit.[7]

On December 30, 2008, a commercial truck driver named Frederick Grant ("Grant") was delivering a truckload of waste to the Seneca Meadows Landfill.  At approximately 6:00 p.m., Grant had delivered his load and was preparing to exit the landfill and turn left onto Route 414, going North, toward the Thruway exit.  At that same moment, Burl Osborne ("Plaintiff") was riding in a car driven by his daughter's fiance/boyfriend, Jeffrey Jones ("Jones"), heading north on Route 414.  Plaintiff was an off-duty deputy employed by the Seneca County Sheriff's Department, dressed in civilian clothing, and was carrying a pistol. As Grant turned into the roadway, Jones had to swerve in order to avoid a collision with Grant's truck.[8]  Gary Bessette ("Bessette"), another truck driver, who was familiar with Grant, was also exiting the landfill at the same time, and witnessed the near-collision between Grant's truck and the car in which Plaintiff was riding.  After the near collision, Grant drove north to the travel plaza.  Plaintiff directed Jones to pursue Grant.  In that regard, Plaintiff and Jones were in Jones' private vehicle, which did not have any type of police markings or lights.  Bessette exited the landfill and also went north on Route 414, but stopped at the Nice N Easy convenience store, while Plaintiff and Jones followed Grant north to the travel plaza.

At the travel plaza, Plaintiff directed Jones to follow Grant's truck into the parking lot, and Plaintiff  exited Jones' car and, after chasing Grant's truck around the parking lot on foot

---

[7]The Court is familiar with this area, and also takes judicial notice of the locations from maps.

[8]Jeffrey Jones, the driver of the vehicle in which Plaintiff was a passenger, indicated to police that he "swerved to avoiding hiting [Grant's truck] and went off the road." Docket No. [#28-2] at p. 13.

with his gun drawn, pointed his gun at Grant, who was still inside his truck.  Plaintiff ordered Grant to get out of his truck, and threatened to shoot Grant if he did not comply.  Grant got out of the truck, and Plaintiff held him at gunpoint for several minutes until members of the Seneca County Sheriff's Department arrived.

There were a number of witnesses to these events.  Of those, on December 30, 2008, the Seneca County Sheriff's Department took written statements from at least the following persons: 1) Grant; 2) Bessette; 3) Jones; 4) James Onley ("Onley"); 5) Matthew Springer ("Springer"); 6) Thomas Smith ("Smith"); and 7) Anton Heindl ("Heindl").

To the extent that some of these affidavits are pertinent to the subject motion, the Court will quote them extensively.  Regarding the traffic incident that led to the violent confrontation, Bessette gave a statement, as follows:

> On 12/30/08 I was leaving the Seneca Meadows land fill.  Fred Grant was ahead of me.  There was a dark vehicle coming up [Route 414,] he was about 2 tractor trailer lengths behind Fred.  I watch him pick up speed and I thought he was going to pass Fred Grant on the right but he backed out it [sic] and stayed right behind him.  I turned around because I decided not to go to the Petro.  To me I didn't think anything of it.

Docket No. [#29-3] at p. 12.  This statement from Bessette obviously does not mention events at the travel plaza.  However, as will be discussed further below, it is evident that although Bessette  did not go to the Petro travel plaza immediately after leaving the landfill, he went there shortly thereafter because he was at the Petro travel plaza when Seneca County Sheriff's deputies took his statement as part of their investigation into Plaintiff's "arrest" of Grant.

Regarding events at the travel plaza, Grant gave a sworn statement, which indicates, in pertinent part:

> They [Osborne and Jones] followed me into the Petro truck stop and followed me around the parking lot . . . then [Osborne] ordered me out of the truck by gunpoint w/out telling me he was an officer and when I asked him several times to put his gun down I begged him and he said get out lay on the ground and shut up or he would put 15 rounds into my head.  Still not telling me he was an officer yet.  Then I got out almost in tears and he grabbed me [and] held the gun in front of me a couple feet away and ordered me to shut up or he would shoot me.  Another man I work with [Springer] asked the man with the gun for identification and he showed it.  I tried to walk away and shut my truck off and he [Osborne] held onto me and said don't move I'm telling you I'll kill you like you tried to kill me.  Then the officer showed up. [sic]

Docket No. [#29-3] at pp. 5-6.

James Onley also provided a written statement to Seneca County Sheriff's deputies,

which indicates, in pertinent part:

> [On] 12-30-08 about 1700 I pulled into Petro, I was looking for place to park up front.  As I was circling the parking lot I notice[d] a semi, speeding kicking up dirt.  Then I saw a black Jeep with [the] passenger door open.  The passenger was running after the truck yelling ["G]et him Jeff["] [evidently referring to Jones, who was driving the Jeep]  Then I saw an opening and as I was parking I notice[d] a man with [illegible] blue coat, Levis - pointing a gun at the truck driver . . . he came around [the] corner . . .  yelling at him, to get out of truck or he would shoot him.  The [truck] driver tried to put it in reverse to get away but by this time, the man with gun was by [the] driver['s] door.  And I could see [that the] people in [the] truck was scared.  What was done on [the] driver's side I don't know.

Docket No. [#29-3] at p. 15 (emphasis added).

Matthew Springer's statement  similarly details the events, and states in pertinent

part:

> [A]s I exited the rear door of the building toward my truck, I noticed a tractor trailer pulling in and a Jeep was coming behind it sliding sideways across the parking lot. The driver of the truck stopped next to me and stated the psycho behind has a gun.  Freddy the driver continued thru the parking lot toward the

fuel island to get away from the guy with the gun and the driver of the Jeep continued to follow him.  I approached the guy with the gun and told him put the gun away, and he didn't say a word and he then took off between the parked trucks.  I had started to walk toward the fuel islands because Freddy had drove in that direction but he just made a loop and came right back behind the Petro building and stopped.  I walked back over to Freddy's truck and when I came around to the driver side the guy in the blue coat with the gun was standing on the side of his truck with the gun pointed at him and was screaming at him calling him a rotten fucker and numerous other curse words and was telling him to get out of the truck.  I still at this point hadn't heard the man identify himself but I yelled at Freddy to get out of the truck and as soon as he did the guy pushed him against the truck and had the gun to his head.  I pushed the gun down from Freddy's head and got between them and he started yelling at me that I'm going to have you arrested and that was when he said he was a cop and I demanded that he show me ID and after several requests he showed me his ID.  I kept telling him if the cops are coming put the gun down and calm down Freddy's not going anywhere.  [He] never calmed down and continued to act like he was crazy and at no time did anyone make any threats toward him.  I was afraid that if Freddy hadn't listened to the guy he was acting crazy enough that I thought he was going to shoot him.  After the other officer showed up in uniform the guy calmed down and back[ed] away from Freddy and put his gun away.

Docket No. [#29-3] at p. 16.

As mentioned earlier, sheriff's deputies also took statements from Smith, Heindl and Jones, which essentially corroborate various aspects of Grant's, Onley's and Springer's versions of events.[9]

No criminal charges were filed against anyone as a result of the December 30, 2008, incident and the ensuing investigation by the Seneca County Sheriff.

---

[9]Although not necessarily pertinent to the instant motion, the Court observes that in opposing a separate summary judgment motion by defendant Robert Schultz, Plaintiff did not dispute the basic description of the event provided by the witnesses.  At most, there may be a dispute as to when, during the confrontation, Plaintiff identified himself as a police officer.

Prior to the foregoing events, the former Seneca County Sheriff, Leo Connolly ("Connolly"), and several members of his department, had been prosecuted for various alleged acts of corruption. In particular, Connolly was prosecuted by R. Michael Tantillo ("Tantillo"), District Attorney of Ontario County, New York, who had been appointed Special Prosecutor. According to Plaintiff, Tantillo was appointed as special prosecutor because the Seneca County District Attorney, Richard Swinehart ("Swinehart"), who is allegedly a political ally of Connolly's, was being investigated for possible involvement in the alleged wrongdoing by Connolly.[10]

Plaintiff, an employee of the Seneca County Sheriff's Department, claimed to have knowledge of malfeasance by Connolly,[11] although it is unclear from the present record whether Tantillo utilized Plaintiff as a prosecution witness. Swinehart allegedly knew that Plaintiff claimed to have incriminating information about Connolly, although it is unclear when he learned that.[12]

In August 2008, a jury convicted Connolly of two misdemeanor counts of Official Misconduct, in violation of New York Penal Law § 195.00[1]. *See, People v. Connolly*, 63 A.D.3d 1703, 881 N.Y.S.2d 257 (4th Dept. 2009). Connolly appealed those convictions.

On or about May 26, 2009, while Connolly's appeal was pending, Swinehart began looking into the incident on December 30, 2008, involving Plaintiff. As to the timing of the

---

[10]Amended Complaint [#24] at ¶ ¶ 24-25.

[11]*See*, Docket No. [#32-1] at pp. 7-8; *see also*, Amended Complaint [#24] at ¶ 23 (Describing Plaintiff as a "material witness" against Connolly).

[12]*See*, Amended Complaint [#24] at ¶ 4 (Alleging that Swinehart's motive was to "sabotage" Tantillo's prosecution of Connolly). It is unclear to this Court whether Plaintiff testified against Connolly during Tantillo's first prosecution of Connolly.

8

investigation, Swinehart apparently maintains that the Seneca County Sheriff's Department never told him about the incident when it occurred, and that he had only learned about it in March, 2009, when Grant called his office to inquire about the status of any prosecution against Plaintiff. Swinehart subsequently obtained the police reports and statements made on December 30, 2008. Swinehart also requested the assistance of the New York State Police in re-investigating the incident. Robert Schultz ("Schultz"), an investigator with the State Police, was assigned by his supervisor to assist Swinehart with the investigation.[13] Schultz re-contacted witnesses and took additional written statements from Onley and Bessette. The details of the statements that Schultz obtained from Onley, and Bessette are set forth below.

On June 9, 2009, Onley executed an affidavit in Rockford, Illinois, where he lives, and sent it to Schultz.[14] As noted earlier, Onley's original statement had indicated that there was more than one person in the cab of Grant's truck at the time of the incident. ("I could see [that the] *people* in [the] truck was scared.") (emphasis added). In the affidavit he provided to Schultz, Onley provided a more extensive statement, in pertinent part as follows:

> When I was pulling into the Petro I noticed an 18 wheeler garbage hauler truck going fast around the parking lot. All of a sudden I noticed a dark colored Jeep come out of nowhere. It stopped in front of me. The passenger jumped out of the Jeep and yelled, "Go get him, Jeff." He didn't even take the time to close the passenger door. This guy was a white male about 5 foot 8 inches tall, about 200 to 220 pounds, and was wearing blue Levis. He rand towards the parked trucks and the guy in the Jeep followed the garbage hauler truck. I then pulled into an open spot near the Petro building where the restaurant is. I then noticed a bunch of people looking. The guy that got out of the Jeep

---

[13]*See*, Docket No. [#29-2] at p. 6, "Narrative" ¶ 1.

[14]Schultz prepared the affidavit after speaking with Onley on the phone, and mailed it to Onley.

was walking in front of my truck.  I looked out my right mirror and saw the garbage truck coming around behind me.  As the truck came around I then saw the guy that got out of the Jeep pointing a gun at the driver of the truck.  The gun was black and looked like a 45 automatic pistol to me.  The man was only about 10 feet from the driver's side of my truck at this time.  I had my window down and I heard the guy yelling stop or I'll shoot you.  He said this numerous times.  I called 911 on my cell phone and told the dispatcher, "You better get some state troopers out here right now at the Petro back by the restaurant because there is a man with a gun who is going to shoot a truck driver."  The truck driver stopped and the man with the gun walked up to the driver's side of the truck and told the driver to get out.  The driver kept saying, "What did I do, what did I do."  They were about 20 feet from me at the time.  I then noticed the passenger in the truck kind of scooting down in the seat.  The he opened the passenger side door real easy and got out of the truck.  He got behind some other truck drivers.  The guy with the gun was still screaming at the truck driver and the truck driver finally opened the door and got out.  The guy with the gun got right in the face of the truck driver and was pointing the gun at his head.  The guy who was driving the Jeep had come walking up towards the guy with the gun.  Within a couple of minutes a marked police car pulled up.  The guy with the gun then put his gun away on his right side, I believe.  The cop that pulled up never drew his gun, so I think he must have known the guy with the gun.  I never heard the guy with the gun identify himself as a police officer.  The only time I found out was when I gave my statement to the uniformed police officer.  The deputy told me that this cop was just a court deputy.

Docket No. [#29-2] at pp. 10-11 (emphasis added).

On June 27, 2009, Bessette provided an affidavit to Schultz, which provided significantly more information than his original statement to the Seneca County Sheriff's Department.  Specifically, Bessette's affidavit states, in pertinent part:

Back on December 30th, 2008, I was working for Karl Johnson Trucking, Lyndonville, Vermont.  On December 30, 2008 sometime between 5:30 PM and 6:00 PM, I was coming out of the landfill on Route 414 in Waterloo.  Another driver for Karl Johnson Trucking, Fred Grant, was also coming out of the landfill.  He was just ahead of me waiting to turn left onto Route 414.

There was a car on Route 414 in the northbound lane waiting to turn left into the landfill. I saw Fred Grant pull out onto Route 414 to head north. He was in the middle of his turn when I saw a blue Jeep try to go around the car that was stopped waiting to turn left into the landfill. The Jeep also appeared to be trying to pass Fred Grant on the right. I saw the Jeep run off the shoulder of the roadway. It was fishtailing and ended up going into the field towards a driveway from a business across the street. I then saw the Jeep come back onto Route 414 from that driveway. I pulled out onto Route 414 after the Jeep began heading north. . . . I continued northbound and went to the Nice N Easy store at the corner of Route 318 and 414. I went into the store and bought a cup of coffee and a tuna fish sub. My cell phone then rang. It was Fred Grant's girlfriend, Holly. I don't know her last name. Holly was crying and told me that Lester,[15] Fred's brother, called her and was crying and said that some guy had a gun to Fred's head. She said that this was happening at the Petrol [sic] parking lot. I then headed to the Petrol [sic], and when I pulled in at the back of the building there was a man standing there with a gun pointed at Fred. Fred was standing outside of his truck near the driver's side front fender. When I saw this, I stopped my truck and ran into the Petrol [sic] to try to get somebody to call the police. I had left the Nice N Easy so fast that I just threw my cell phone into the truck and I could not find it. I went into the CB shop and asked the guy who was working there to call the police because there was a guy pointing a gun at Fred. I then went back out and walked towards Fred's truck. I saw that there were at least two sheriff's cars and a black unmarked Ford Taurus. I saw that Fred Grant as now in the back of one of the sheriff's cars. I motioned with my hands towards Fred to try to get him to calm down because he was crying. I then saw the guy that had the gun pointed at Fred standing outside of the sheriff's car that Fred was in. I heard him talking to another deputy. I heard him asked [sic] this deputy if he [Grant] was denying that he ran him off the road. The deputy said, "Yes, he is denying it." The guy that had the gun then said, "I should have shot the fat slob when I had the chance."[16] I was about 15 to 20 feet from them at the time. Then another heavyset deputy came up to me and told me to get up on the sidewalk near the Petrol [sic] building. I did this and then a deputy came

---

[15]As indicated, Grant's brother's name is Leslie.

[16]A Seneca County sheriff's deputy concurs that Plaintiff stated, "I should of just shot him." *See*, Docket No. [#32-1] at p. 15. Plaintiff has not denied making the statement, either in connection with this motion or Schultz's summary judgment motion.

up and I told him that I saw Fred Grant pull out of the landfill, and I didn't think he cut this guy off. I was then approached by another deputy, who asked me if I saw what happened. I said yes, and he asked me if I would give a statement. I told him yes and we both went inside the Petrol [sic]. The deputy gave me a statement form and asked me to write down what I saw.

Docket No. [#29-2] at pp. 13-14 (emphasis added).

On June 12, 2009, while Schultz was still conducting his investigation, the New York State Supreme Court, Appellate Division, Fourth Department, reversed Connolly's convictions. *See, People v. Connolly*, 63 A.D.3d 1703, 881 N.Y.S.2d 257 (4th Dept. 2009). Within days, Tantillo announced that he intended to re-prosecute Connolly.[17]

Meanwhile, on July 24, 2009, Schultz also took a written statement from Grant's brother, Leslie Grant ("Leslie"), who is apparently referred to as "Lester" in Bessette's statement above. Leslie claimed to have been the passenger in Grant's truck on December 30, 2008, though the Seneca County Sheriff's Office had not taken a statement from him on that date.[18] In the statement that Leslie provide to Schultz, he gave a description of the near-collision between Plaintiff and Grant, which is similar to Bessette's description. Leslie further indicated that Plaintiff had followed Grant's truck into the travel plaza, and, without identifying himself as a police officer, pointed a gun at Grant and told him to get out of the truck, while threatening to shoot him. Leslie indicated that, while that was taking place, he called Grant's girlfriend and told her that a man was threatening to shoot Grant.

---

[17] *See*, Finger Lakes Times, June 14, 2009, "Connolly's Convictions Tossed," http://www.fltimes.com/news/article_c250683a-7c2e-5add-8637-925549975b65.html For purposes of clarity, the Court refers to this media account even though it is not cited in the parties' papers. In that regard, perhaps because the underlying criminal matters involving Connolly received extensive media coverage, the parties' papers skim over them or omit them altogether, perhaps assuming the reader's familiarity. The Court sets this information forth, however, because it is critical to an understanding of Plaintiff's claims,

[18] *See*, Affidavit of Leslie Grant, Docket No. [#29-2] at pp. 16-18.

In or about late July, 2009, Schultz completed his investigation and provided the results to Swinehart.  Thereafter, as far as the Amended Complaint indicates, Schultz had no further involvement in the matters underlying this action.

To summarize the witness statements, they all generally agree as to the sequence of events that occurred at the travel plaza, namely, that Plaintiff drew his weapon, pointed it at Grant, and threatened numerous times to shoot and kill him if he did not get out of his truck.  Once Grant got out of the truck, Plaintiff put his gun to Grant's head and threatened to kill him like Grant had supposedly nearly killed Plaintiff.  Bessette and Onley indicate that they never heard Plaintiff identify himself as a police officer.  Jones' statement also does not indicate that Plaintiff identified himself as an officer.  Springer, Leslie and Grant all indicate that Plaintiff only identified himself as an officer after Springer got between Plaintiff and Grant and demanded that Plaintiff show identification, by which time Plaintiff had already threatened several times to shoot and kill Grant.  Smith indicated that Plaintiff identified himself as an officer while Grant was still in his truck.  Witnesses variously described Plaintiff's behavior as "psycho" and "crazy," and indicated that Plaintiff cursed and threatened to shoot fifteen rounds into Grant's head.  Two witnesses indicated that after Grant was placed in custody, Plaintiff stated that he should have shot Grant while he had the chance, *i.e.*, before other officers arrived.  In considering the merit of Plaintiff's claims below, the Court makes no finding as to the truthfulness of these witness statements, but merely considers the fact that they were made.

In August 2009, Tantillo made arrangements to present evidence against Connolly to the Seneca County Grand Jury.  In connection with such presentation, Tantillo specifically scheduled a time for Plaintiff to provide testimony before the Grand Jury.  Upon learning that

Tantillo had scheduled Plaintiff to testify, Swinehart and David Mashewske ("Mashewske"), the First Assistant District Attorney, made arrangements to present evidence against Plaintiff to the very same grand jury.  Plaintiff alleges that Swinehart and Mashewske did this with the intention of not only prosecuting him, but of discrediting him and damaging Tantillo's prosecution of Connolly.  Plaintiff countered by obtaining a temporary restraining order from New York State Supreme Court, which temporarily enjoined Swinehart from presenting evidence against Plaintiff to the Grand Jury, and directed Swinehart to show cause why he should not be permanently enjoined from doing so.

Swinehart reacted by having Mashewski file "prosecutors informations" against Plaintiff in the Tyre Town Court, purporting to charge him with two misdemeanors, namely, Menacing in the Second Degree[19] and Reckless Endangerment in the Second Degree.[20] In that regard, Mashewske executed sworn factual statements, indicating, in pertinent part, that Plaintiff "did recklessly engage in conduct which created a substantial risk of serious physical injury to another person," by threatening to shoot Grant with a firearm, and that Plaintiff "did intentionally place or attempt to place another person in fear of physical injury or death," by again displaying a firearm and threatening to use it to shoot Grant.[21] Mashewske also obtained a warrant for Plaintiff's arrest from the Tyre Town Court.  On September 4, 2009, prior to Plaintiff testifying before the Grand Jury,  Plaintiff was arrested

---

[19]New York Penal Law § 120.14(1)  provides that:  "A person is guilty of menacing in the second degree when: 1. He or she intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, dangerous instrument or what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm;"

[20]New York Penal Law § 120.20 provides that: "A person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person."

[21]Docket No. [#32-1] at pp. 27-28.

14

and arraigned on the charges.  Swinehart then issued a press release about Plaintiff's arrest, and gave an interview to the Finger Lakes Times newspaper.   The Amended Complaint does not indicate what exactly Swinehart said about Plaintiff in the press release and interview, but the reasonable inference is that, at a minimum, Swinehart discussed the fact that Plaintiff had been charged, arrested and arraigned.[22]

Meanwhile, in October 2009, in connection with unrelated matters, Defendant Robert Steele ("Steele"), an investigator employed by Swinehart's office, admitted to a Seneca County Sheriff's Lieutenant that the prosecution of Plaintiff was specifically intended to discredit Plaintiff as a witness against Connolly, and to "damage [Tantillo's] prosecution" of Connolly.[23]  Unbeknownst to Steele, his statement was  recorded, and the Seneca County Sheriff's Department later provided the recording to Plaintiff.

In December 2009, Plaintiff succeeded in having the Prosecutor's Informations dismissed.  Subsequently, though, Swinehart and/or Mashewske had Steele execute criminal informations against Plaintiff, that were supported by the aforementioned affidavits given to Schultz by Bessette and Leslie.  Also in support of the criminal informations, on December 15, 2009, Steele executed a sworn factual statement, indicating, in pertinent part, that on December 30, 2008, Plaintiff consciously disregarded a substantial and unjustifiable risk of physical injury to another person, by "step[ping] in front of a moving 18 wheel tractor trailer truck, display[ing] a firearm and threaten[ing] to shoot Fredrick A. Grant, Jr."[24]

---

[22]See, Amended Complaint ¶ 49.

[23]See, Amended Complaint [#24] ¶ ¶ 5, 50,57.

[24]Docket No. [#29-3] at p. 4.

15

Thereafter Patrick Morrell ("Morrell"), Assistant Seneca County District Attorney, filed the informations with the Tyre Town Court.

During the ensuing prosecution of Plaintiff by Swinehart and his staff, Plaintiff alleges that Swinehart, Mashewske, Morrell and Mark Sinkewicz ("Sinkewicz"), Assistant Seneca County District Attorney, all failed to turn over exculpatory material, consisting of the statements given by Bessette and Grant on December 30, 2008. Plaintiff's theory as to why those statements are exculpatory is somewhat convoluted, but essentially he indicates that because those statements did not mention Leslie, they tend to prove that Leslie was not actually a passenger in Grant's truck on December 30, 2008, and could not have witnessed the near-collision or the incidents at the travel plaza.

Later, on the "eve of trial" of the charges against Plaintiff in Tyre Town Court, Morrell and Sinkewicz, who were, by that time, handling the prosecution for the Seneca County District Attorney's Office,[25] informed the presiding judge that they had a conflict of interest, based on Steele's alleged statements concerning the prosecution, and on the fact that they were both involved in the investigation of the case against Plaintiff and in the decision to charge him. In response, the presiding judge appointed Richard Healy, Wayne County District Attorney, as Special Prosecutor. Healy subsequently provided Plaintiff with the discovery that Plaintiff maintains had been withheld by Swinehart's office.

On July 25, 2010, Plaintiff moved to dismiss the charges against him on speedy-trial grounds. By Order dated August 2, 2010, the Tyre Town Court dismissed the charges against Plaintiff, with prejudice. Plaintiff maintains that the judge based his ruling on his

---

[25]In January, 2010, a new district attorney took office, and Swinehart and Mashewske went into private practice.

finding that Swinehart's office had acted with malice in prosecuting him, though the actual order of dismissal does not include such a finding.[26]

The reader is again reminded that the foregoing recitation of facts is based on the unproven *allegations* in the Amended Complaint, which the Court is required to accept as true when ruling upon a 12(b)(6) motion to dismiss.

On August 1, 2011, Plaintiff commenced this action.  The Amended Complaint [#24] purports to assert three causes of action: 1) malicious prosecution against all defendants; 2) violation of Plaintiff's Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983; and 3) a § 1983 *Monell* liability claim against Seneca County based on a failure to properly hire and train its employees.  The individual plaintiffs are sued in their individual and official capacities.

The underlying theme of the Amended Complaint is that Swinehart and his staff improperly obtained and utilized the two statements that Bessette and Leslie provided to Schultz.  The pleading contends that those two statements were false, that Defendants knew they were false, and that Schultz obtained the false statements at Swinehart's behest.[27]  Significantly, though, the pleading does *not* allege that any of the other witness statements are false.  Specifically, the Amended Complaint does not allege that the witness statements taken on December 30, 2008, some of which were quoted extensively above, are false, or that the statement Schultz obtained from Onley is false.

---

[26]*See*, Docket No. [#32-1].

[27]*See*, Amended Complaint [#24] ¶ ¶ 4, 40, 52, 54, 56, 66, and 68.

Defendants have moved to dismiss the Amended Complaint for the reasons discussed below. [28]

## DISCUSSION

The general legal principles concerning motions under FRCP 12(b)(6) are well settled:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007); *see also, ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (*quoting Bell Atl. Corp. v. Twombly* ) (footnote omitted).

When applying this "plausibility standard," the Court is guided by "two working principles":

---

[28]Plaintiff has raised certain technical objections to Defendants' motion, concerning the timing of the motion and the length of Defendants' papers. *See*, Pl. Mem. of Law [#31-1] at pp. 1-4.  However, the Court in its discretion denies those objections, and will consider Defendants' motion on the merits.

First, although a court must accept as true all of the allegations contained in a complaint,[29] that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss, and determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations and internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 1950 (2009) (citation omitted). "The application of this 'plausibility' standard to particular cases is 'context-specific,' and requires assessing the allegations of the complaint as a whole." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Medical Centers Retirement Plan v. Morgan Stanley Inv. Management Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (citation and internal quotation marks omitted).

Before considering the legal sufficiency of Plaintiff's claims, the Court will consider which contentions are plausibly pleaded in the Amended Complaint, and which are not. At the outset, the pleading does not plausibly maintain that Defendants used fabricated evidence to prosecute Plaintiff. That is to say, the pleading does not plausibly maintain that the affidavits which Schultz obtained from Bessette and Leslie, or from any other witnesses, were false. At most, the pleading indicates that the affidavits which Schultz obtained were

---

[29]The Court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir.1999), *cert. den.* 531 U.S. 1052, 121 S.Ct. 657 (2000).

more-detailed than the affidavits initially obtained by the Seneca County Sheriff's Department.[30] However, the fact that a later sworn statement contains additional details that were not present in an earlier statement, where the additional details do not directly contradict the earlier statement, does not plausibly suggest that the later statement is false. In short, the Amended Complaint lacks factual assertions plausibly suggesting that the affidavits are false.

In any event, the statements that Bessette and Leslie provided to Schultz are almost identical in their details to the statements of other witnesses, whose veracity Plaintiff is not questioning in connection with this motion. Accordingly, to the extent that Plaintiff is suggesting that the Defendants needed fabricated statements from Bessette and Leslie in order to prosecute him, the Court disagrees. Furthermore, the pleading does not plausibly suggest that the decision to re-investigate the incident and prosecute Plaintiff was unreasonable in light of the un-objected-to witness statements.

Apart from the alleged inconsistencies in the witness statements, which are not actual inconsistencies, Plaintiff relies on allegations as to what Steele allegedly stated to a Seneca County Sheriff's Lieutenant about the prosecution to show that Defendants falsified evidence. However, those allegations do not plausibly support Plaintiff's contention that the statements of Bessette and Leslie are false. In that regard, paragraphs 4 and 50 of the Amended Complaint suggest, in conclusory fashion, that Steele admitted that Swinehart

---

[30]Plaintiff's focus on the affidavits of Bessette and Leslie in this regard would, if considered in isolation, be somewhat puzzling in any event, since, for the most part, they merely say the same things that the other witnesses indicated, namely, that Plaintiff drew his weapon, threatened to shoot Grant if he did not get out of his truck and held Grant at gunpoint until other officers arrived. Such focus can be understood, however, in relation to the discussion below of absolute prosecutorial immunity. That is, in order to evade the doctrine of absolute immunity, Plaintiff would need to show that Swinehart and his employees committed acts during the investigative phase of the case.

"concocted charges" against Plaintiff and "helped two disreputable and unbelievable 'witnesses' fabricate false accusations."  However, paragraph 5 of the Amended Complaint is where Plaintiff  purports to allege what Steele *actually said*, and it does not indicate that Steele said that Swinehart fabricated evidence.  Instead, it says that Steele stated two things:  1) Swinehart *timed*  the prosecution to assist Connolly; and 2) "there was evidence in the possession of the *special prosecutor* which would exonerate Deputy Osborne." (emphasis added).[31] The timing of the prosecution does not involve fabrication of evidence, and as will be discussed below, *i.e.*, a prosecutor's decisions regarding the timing of a prosecution are immune form liability in any event.   Similarly, the fact that the special prosecutor may have had exculpatory information about Plaintiff is also not the same as saying that Swinehart fabricated evidence.  In that regard, the pleading is obviously referring to Healy, the Wayne County District Attorney, who was appointed as special prosecutor in Plaintiff's case.  Moreover, the "exculpatory information" to which Steele allegedly referred consists of statements that Bessette and Grant gave to the Seneca County Sheriff's Department on the night of the incident, December 30, 2008. *See*, Amended Complaint [#24] at ¶ ¶ 54 & 60 (Alleging that Swinehart committed a *Brady* violation by failing to turn over the statements by Bessette and Grant, but that Healy, the Special Prosecutor, turned over those materials to Plaintiff).  Plaintiff contends that those statements are exculpatory,

---

[31]Amended Complaint [#24] at ¶ 5.  While it is not a basis of the Court's decision herein, the Court observes that in connection with Defendant Schultz's separate motion for summary judgment, Plaintiff submitted an affidavit from Seneca County Sheriff's Lieutenant John Cleere, who actually recorded the statement by Steele.  According to Cleere, Steele "indicated that the reason that the District Attorney's Office needed to present Deputy Osborne's matter to the same grand jury which would hear him as a witness in the case against the former sheriff, was to prevent Dep. Osborned from being 'exonerated.'" Docket No. [#32-1] at pp. 11-12, ¶ 7.  Cleere's affidavit does not mention any alleged admission by Steele concerning fabrication of evidence.

because they contain less information than statements later obtained by Schultz.[32] However, as already discussed, the later statements are not false simply because they contain more information than was included in the earlier statements.

Similarly, the pleading fails to plausibly plead that a conspiracy existed between Schultz and Swinehart concerning the fabrication of evidence.  Plaintiff's claims are premised on the idea that State Police Investigator Schultz, acting at Swinehart's behest, obtained fabricated statements from Bessette and Leslie.  However, such allegation is entirely conclusory.  The pleading does not attempt to explain why Schultz would have falsified evidence for Swinehart.  For example, there is no indication that the two men even knew each other prior to Schultz being assigned to investigate the matter by his superior. Nor does the pleading plausibly allege facts indicating that the two men actually made an agreement to fabricate evidence.  The plausibility of Plaintiff's conclusory allegations on this point is further undercut by the fact that the affidavits that Schultz supposedly falsified are merely duplicative in most respects of the affidavits of the other witnesses, which Plaintiff does not claim are false.

The pleading, however, does contain some plausible allegations.  Specifically, the pleading plausibly indicates that Swinehart and his staff acted, at least in part, if not entirely, based on an improper motives.  That is, the pleading plausibly indicates that the decision to prosecute Plaintiff, and the specific steps which the movants took to prosecute him, were motivated by  a desire to punish Plaintiff for assisting Tantillo and/or to hinder Tantillo's re-prosecution of Connolly by discrediting Plaintiff.  Overall, then, the pleading does not indicate that Swinehart and his staff used fabricated evidence, but it does allege that they

---

[32]*See*, Amended Complaint [#24] at ¶ ¶ 32-38.

prosecuted Plaintiff with improper motives.  The Court will now consider whether those allegations are legally sufficient to maintain the causes of action asserted in the Amended Complaint.

### Malicious Prosecution

Plaintiff's § 1983 claim and his state-law malicious prosecution claim are governed by the same principles:

> "Claims for ... malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for ... malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir.2003) (*citing Conway v. Village of Mount Kisco*, 750 F.2d 205, 214 (2d Cir.1984)). "Because there are no federal rules of decision for adjudicating § 1983 actions that are based upon claims of malicious prosecution, [courts] are required by 42 U.S.C. § 1988 to turn to state law-in this case, New York state law—for such rules." *Conway*, 750 F.2d at 214.
>
> The elements of a malicious prosecution claim in New York are: (1) the defendant initiated a prosecution against the plaintiff, (2) the defendant lacked probable cause to believe the proceeding could succeed, (3) the defendant acted with malice, and (4) the prosecution was terminated in the plaintiff's favor. *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir.2000).

*Negron v. Wesolowski*, 536 Fed.Appx. 151, 153,  (2d Cir. Oct. 28, 2013).

### Prosecutorial Immunity

The individual movants all maintain that they are absolutely shielded from liability by federal and state doctrines of prosecutorial immunity.[33]  For claims under Section 1983, Prosecutors have absolute immunity, from actions seeking damages, for acts committed in

---

[33]Swinehart maintains that he is entitled to only qualified immunity insofar as Plaintiff's claim is based on Swinehart's press release and interview following Plaintiff's arrest.

their capacity as advocates, such as when commencing and pursuing prosecutions.  This

is true even when the prosecutor's actions are alleged to have been intentionally wrongful:

> [A] defense of absolute immunity from a claim for damages must be upheld
> against a § 1983 claim that the prosecutor commenced and continued a
> prosecution that was within his jurisdiction but did so for purposes of
> retaliation, or for purely political reasons.  A prosecutor is also entitled to
> absolute immunity despite allegations of his knowing use of perjured testimony
> and the deliberate withholding of exculpatory information.  *Although such
> conduct would be reprehensible,* it does not make the prosecutor amenable
> to a civil suit for damages.  In sum, the nature of absolute immunity is such
> that it accords protection from any judicial scrutiny of the motive for and
> reasonableness of official action. *In the realm of absolute immunity, evaluation
> of motive and reasonableness is forbidden.*  These principles are not affected
> by allegations that improperly motivated prosecutions were commenced or
> continued pursuant to a conspiracy.

*Shmueli v. City of New York*, 424 F.3d 231, 237-238 (2d Cir. 2005) (citations and internal

quotation marks omitted); *see also, Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)  ("[A]bsolute

immunity protects a prosecutor from § 1983 liability for *virtually all acts, regardless of

motivation*, associated with his function as an advocate.") (emphasis added).

Such absolute immunity also applies to a prosecutor's staff for acts closely associated

with the judicial process:

> Because absolute immunity is essential to safeguarding the integrity of the
> judicial process, it extends to those performing functions closely associated
> with that process.  This includes not only officials performing discretionary acts
> of a judicial nature, but also individual employees who assist such an official
> and who act under that official's direction in performing functions closely tied
> to the judicial process.

*Hill v. City of New York*, 45 F.3d 653, 660 (2d Cir. 1995) (emphasis added; citations

omitted).

One might well ask why, if a prosecutor acted with an improper motive, he should be entitled to any kind of immunity.  The absolute immunity doctrine for prosecutors reflects a policy decision that it is better to allow the misconduct of a few bad prosecutors to go unredressed than to allow the majority of honest prosecutors to  be bombarded with lawsuits.  The United States Supreme Court explained the reasoning behind the doctrine as follows:

> The common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties.  These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust. One court expressed both considerations as follows:  "The office of public prosecutor is one which must be administered with courage and independence. Yet how can this be if the prosecutor is made subject to suit by those whom he accuses and fails to convict? To allow this would open the way for unlimited harassment and embarrassment of the most conscientious officials by those who would profit thereby. There would be involved in every case the possible consequences of a failure to obtain a conviction.  There would always be a question of possible civil action in case the prosecutor saw fit to move dismissal of the case. . . . The apprehension of such consequences would tend toward great uneasiness and toward weakening the fearless and impartial policy which should characterize the administration of this office. The work of the prosecutor would thus be impeded, and we would have moved away from the desired objective of stricter a fairer law enforcement." *Pearson v. Reed*, 6 Cal.App.2d 277, 287, 44 P.2d 592, 597 (1935).

***

> A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court. The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages. Such suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of

improper and malicious actions to the State's advocate.   Further, if the prosecutor could be made to answer in court each time such a person charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law.

*Imbler v. Pachtman*, 424 U.S. 409, 422-425,  96 S.Ct. 984, 991-992 (1976) (footnote and citations omitted); *see also, Kalina v. Fletcher*, 522 U.S. 118, 125, 118 S.Ct. 502, 507 (1997) ("[I]t is the interest in protecting the proper functioning of the office, rather than the interest in protecting its occupant, that is of primary importance.").

The problem, of course, is that an unscrupulous prosecutor may evade civil liability for his misdeeds.  Moreover, the public's trust in its elected officials may be further eroded. *See, Hill v. City of New York*, 45 F.3d at 656  ("When this doctrine, necessary to preserve the integrity  of the judicial process, shields an alleged egregious and contemptible abuse of official power it is of course very troubling.").  Nevertheless, whether one thinks it is fair or not, the doctrine of absolute prosecutorial immunity is a binding principle of law which this Court must apply to those actions which a prosecutor takes in his capacity as an advocate for the People.

On the other hand, in Section 1983 actions, qualified immunity, not absolute immunity, applies when prosecutors perform *investigative* functions normally performed by a detective or police officer. *Zahrey v. Coffey*, 221 F.3d 342, 346 (2d Cir. 2000).  "The line between a prosecutor's advocacy and investigating roles might sometimes be difficult to draw." *Id.*, 221 F.3d at 347.  For example, in a case involving alleged fabrication of evidence by a prosecutor, the Second Circuit has held that the timing of the act would determine whether it was investigative or prosecutorial.  Specifically, the Circuit Court stated that a prosecutor who procured false grand jury testimony from a witness after making a decision

to indict would have absolute immunity, while a prosecutor who sought false evidence "in order to get probable cause to arrest" would have only qualified immunity. *See, Hill v. City of New York*, 45 F.3d at 662.  In this regard,

> the "functional" test for absolute immunity is an objective one; it does not depend upon the state actor's subjective intent. . . . [I]nvestigative work may not be transformed into advocacy simply by being characterized as work in preparation for trial, otherwise, absolute immunity against a suit brought by an innocent citizen for a constitutional wrong would always protect a district attorney who simply forces such a case to trial.  The same rationale applies when a prosecutor manufactures evidence for the purpose of obtaining probable cause to arrest a suspect, even when the evidence obtained is in a form suitable for later presentation to the grand jury.

*Id*. (citations omitted).

The foregoing discussion of absolute and qualified immunity pertains to claims under 42 U.S.C. § 1983.  Similarly, as to claims brought under New York State law, government employees have absolute immunity for their discretionary judicial and quasi-judicial acts. *See, Cornejo v. Bell*, 592 F.3d 121, 130 (2d Cir. 2010); *see also, Carossia v. City of New York*, 39 A.D.3d 429, 430, 835 N.Y.S.2d 102, 104 (1st Dep. 2007) ("Defendants are entitled to immunity for those governmental actions requiring expert judgment or the exercise of discretion. This immunity is absolute when the action involves the conscious exercise of discretion of a judicial or quasi-judicial nature") (citation and internal quotation marks omitted).   On the other hand, under New York law, prosecutors enjoy only qualified immunity for "investigative, law-enforcement" type acts. *Claude H. v. County of Oneida*, 214 A.D.2d 964, 965, 626 N.Y.S.2d 933, 935 (4th Dept. 1995) ("Where a prosecutor goes outside his quasi-judicial role, however, and acts as an investigator or police officer, he is entitled only to qualified immunity.") (citations omitted).

Although absolute immunity is an affirmative defense, it is appropriate to address absolute immunity in a 12(b)(6) decision if the complaint clearly indicates the nature of the function for which the defendant is being sued:

> [A]lthough absolute immunity is an affirmative defense whose availability depends on the nature of the function being performed by the defendant official who is alleged to have engaged in the challenged conduct, the nature of that function is often clear from the face of the complaint. In that circumstance, the absolute immunity defense may be resolved as a matter of law on a motion to dismiss the complaint pursuant to Rule 12(b)(6).

*Shmueli v. City of New York*, 424 F.3d at 236 (citations and internal quotation marks omitted).  Conversely,

> when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss.

*Hill v. City of New York*, 45 F.3d at 663 (finding that there were issues of fact as to whether prosecutor who took false videotaped statement, purportedly for use in grand jury, was acting in investigative capacity).

In the instant case, the Amended Complaint clearly indicates that virtually all[34] of the complained-of acts are protected by absolute prosecutorial immunity.  In that regard, the Court reiterates that the pleading does not plausibly indicate that Defendants committed any wrongdoing in connection with the investigation of the incident for which Plaintiff was charged.  Specifically, the pleading does not plausibly allege that Schultz obtained false

---

[34]As mentioned earlier, Swinehart admits that he would be entitled to only qualified immunity with regard to his action in conducting a press conference.  However, the Amended Complaint does not indicate that Swinehart said anything false during the press conference, or that he otherwise committed any type of independent tort by conducting a press conference following Plaintiff's arrest and arraignment.

affidavits from Bessette or Leslie, or that Swinehart or his employees directed Schultz to do so.  All of the complained-of acts occurred after Swinehart's office received the investigative materials from the Seneca County Sheriff's Department and the New York State Police.  As discussed further below, those materials provided probable cause to prosecute Plaintiff. Defendants' subsequent acts pertained to the decision whether to prosecute Plaintiff, and the actual prosecution.

Plaintiff does not dispute that Defendants' acts, with regard to the decision to prosecute him and the actual prosecution, are protected by absolute immunity.  Instead, he maintains that Defendants are liable for wrongdoing in their "investigatory capacity," which consisted of obtaining and utilizing false affidavits from Bessette and Leslie.[35]  However, since the pleading does not plausibly allege that Defendants engaged in such wrongdoing, Plaintiff's argument lacks merit.  Accordingly, based on the parties' submissions the individual Defendants are entitled to absolute prosecutorial immunity as to the § 1983 and state-law malicious prosecution claims.

*Probable Cause*

Alternatively, and apart from the issue of absolute immunity, the individual Defendants maintain that the pleading fails to state a claim against them, under either § 1983 or New York State law, because there was probable cause to arrest and prosecute

---

[35] *See*, Pl. Memo of Law [#31-1] at p. 8 ("[P]laintiff has alleged facts that show the misconduct for which redress is sought occurred in the defendants' investigatory capacity for which they do not enjoy absolute immunity.  Thus, their subsequent *immunized* act of commencing a criminal action does not break the chain of causation and insulate them from the reasonably foreseeable consequences of violating the plaintiff's constitutional rights.") (emphasis added).

Plaintiff.[36][37]   The Court agrees.   In that regard, "[t]he existence of probable cause will defeat

a claim of malicious prosecution." *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012).

A defendant making such a motion at the pleading stage often faces a "formidable hurdle,"

since to properly dismiss a malicious prosecution complaint on a 12(b)(6) motion based on

the existence of probable cause, the defendant must show "based only on the complaint and

documents attached to the complaint that probable cause existed." *Barnett v. Mount Vernon*

*Police Dept.,*  523 Fed.Appx. 811, 813, 2013 WL 1846317 at *1 (2d Cir. May 3, 2013).

"Probable cause, in the context of malicious prosecution, has . . . been described as

such facts and circumstances as would lead a reasonably prudent person to believe the

plaintiff guilty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003).   That is, "the

relevant question is whether there was probable cause to believe the prosecution of

[Plaintiff] could succeed." *Id*. at n. 7.   "[P]robable cause is an assessment of probabilities,

not an ascertainment of truths." *Loria v. Gorman*, 306 F.3d 1271, 1288-1289 (2d Cir. 2002).

Significantly in that regard, "[w]hen information is received from a putative victim or an

eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's

veracity." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citation omitted).

---

[36]See, Def. Supp. Memo of Law [#28] at pp. 2-9.

[37]Or, at least, they contend that they are entitled to dismissal on the basis of qualified immunity, since it was reasonable for them to believe that probable cause existed.  To obtain dismissal based on qualified immunity, the defendant must show, based on the complaint, that there was arguable probable cause. *See, Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013) ("[A]n officer will . . . be entitled to qualified immunity ... if he can establish that there was 'arguable probable cause' to arrest.  Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.") (citations omitted); *see also, Anilao v. Spota*, 774 F.Supp.2d 457, 491-492 (E.D.N.Y. 2011) ("Although qualified immunity typically is asserted by police officers, the qualified immunity standard of arguable probable cause also applies to prosecutors.") (citations omitted).

In this case, Plaintiff contends that he was maliciously prosecuted for Menacing in the

Second Degree and Reckless Endangerment in the Second Degree.  As to the first of these,

> [a] person is guilty of menacing in the second degree when: 1. He or she
> intentionally places or attempts to place another person in reasonable fear of
> physical injury, serious physical injury or death by displaying a deadly weapon,
> dangerous instrument or what appears to be a pistol, revolver, rifle, shotgun,
> machine gun or other firearm[.]

New York Penal Law  120.14(1).  As to the second, "[a] person is guilty of reckless

endangerment in the second degree when he recklessly engages in conduct which creates

a substantial risk of serious physical injury to another person."  New York Penal Law §

120.20.

Based upon the sworn witness statements that were provided to Swinehart and his

staff, the Court has little difficulty in finding, as a matter of law, that probable cause existed

to prosecute Plaintiff for Menacing in the Second Degree and Reckless Endangerment in

the Second Degree.[38]  The witness statements indicate that far from effecting an ordinary

---

[38]As to Reckless Endangerment in the Second Degree, *see*, *People v. Hagood*, 93 A.D.3d 533, 534, 940 N.Y.S.2d 262, 262-263 (1st Dept. 2012) (riding bicycle on crowded sidewalk and then threatening police officers by raising fists  provided probable cause to arrest for Reckless Endangerment in the Second Degree), *leave to appeal denied*, 19 N.Y.3d 973, 950 N.Y.S.2d 356 (2012);  *see, also, In re William H.*, 264 A.D.2d 676, 677, 695 N.Y.S.2d 93, 94 (1st Dept. 1999) (Throwing lit firecrackers in front of moving police van provided probable cause to arrest for Reckless Endangerment in Second Degree); *People v. Richardson*, 97 A.D.2d 693, 694, 468 N.Y.S.2d 114, 115 (1st Dept. 1983) (Finding that pointing a loaded gun at someone and threatening to shoot is sufficient to establish the crime of Reckless Endangerment in the Second Degree); *Guynup v. County of Clinton*, 74 A.D.3d 1552, 1555-1556, 903 N.Y.S.2d 580, 583 (3d Dept. 2010) (Indicating that threatening someone with a loaded firearm would have constituted Reckless Endangerment in the Second Degree); *People v. Davis*, 72 N.Y.2d 32, 36, 526 N.E.2d 20, 22, 530 N.Y.S.2d 529, 531 (1988) ("Reckless endangerment frequently involves the use of firearms, but no case has been found which holds that the mere threatened use of a[n inoperable] gun is sufficient to support a reckless endangerment conviction and there are decisions holding that it does not.  The cases generally require that the weapon be fired, or at a minimum, capable of firing."); ( *but see, People v. Martinez*, 166 A.D.2d 882, 883, 560 N.Y.S.2d 542, 543 (4th Dept. 1990) (finding that threatening to shoot a child with a loaded shotgun if police attempted to enter an apartment, where there was no indication that the police were going to enter the apartment, was insufficient to support a conviction under New York Penal Law § 120.20).

arrest for a traffic infraction, Plaintiff was enraged or, at least, out of control, and without identifying himself as an officer, escalated the incident and threatened multiple times to kill Grant with a loaded gun in a busy travel plaza, thereby creating a substantial risk of physical injury to Grant and others.[39]   The issue on this motion is not whether those statements are accurate, but whether there was any reason for Defendants to disbelieve them, which there was not.   At least, no such reason has been plausibly pleaded.   Such probable cause existed even without regard to the two affidavits that Plaintiff maintains were false, although, again, Plaintiff has not made out a plausible claim that any of the witness statements were false or otherwise unreliable. Consequently, the Amended Complaint fails to state a claim for malicious prosecution under either § 1983 or state law.

### Monell Claim and Respondeat Superior Claim Against Seneca County

The Amended Complaint contends that Seneca County is liable under § 1983 for the alleged malicious prosecution of Plaintiff, since it failed to properly hire, train and supervise the Seneca County District Attorney's Office.   However, since the Court is dismissing the underlying malicious prosecution claims for failure to state a claim, the *Monell* claim also necessarily fails. *Seymore v. Department of Corr Services*, No. 11 Civ. 2254(JGK), 2014 WL 641428 at *8 (S.D.N.Y. Feb. 18, 2014) ("*Monell* only 'extends liability to a municipal organization where that organization's failure to train, or the policies or customs that is has sanctioned, led to an independent constitutional violation.' *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir.2006). Where, as here, a plaintiff does not allege an underlying

---

[39]The alleged excessively violent and disproportionate nature of the confrontation is all the more difficult to understand considering that it was arguably unnecessary for Plaintiff to do anything.  As Plaintiff maintains, he had already called 911 about the alleged traffic infraction, an officer was on his way to the scene, and Grant had entered the travel plaza and was most likely going to still be there when the patrol officer arrived. *See*, Docket No. [#31] at p. 4, ¶ ¶ 20-21.

constitutional violation, there can be no liability under Monell. *Id*.") (other citation omitted).

Plaintiff similarly contends that Seneca County has *respondeat superior* liability for the alleged state-law malicious prosecution.[40]  However, that claim must also be dismissed since the Court has dismissed the underlying state tort claims against the individual defendants. *Shapiro v. Kronfeld*, No. 00 Civ.6286(RWS), 2004 WL 2698889 at *24 (S.D.N.Y. Nov. 24, 2004) ("[T]here can be no imposition of vicarious liability in the absence of underlying liability.")

CONCLUSION

Defendants' motion to dismiss [#26] is granted and this action is dismissed with prejudice.

SO ORDERED.

Dated:        June 6, 2014
              Rochester, New York

                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge

---

[40]*See*, Docket No. [#31-1] at p. 12.